IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

MARCUS WASHINGTON,

                              Petitioner,

            v.                          CASE NO. 11-3045-SAC

RAYMOND ROBERTS, et al.,

                       Respondents.


MEMORANDUM AND ORDER


     This matter is a petition for habeas corpus filed pursuant to 28 U.S.C. § 2254.

*Procedural background*

     Petitioner was convicted in the District Court of Wyandotte County, Kansas, on one count of first-degree premeditated murder in violation of K.S.A. 21-3401 and one count of criminal possession of a firearm in violation of K.S.A. 21-4204. He was sentenced to life without parole for 50 years and a concurrent term of 18 months. His motion for new trial was denied.

     On direct appeal, the Kansas Supreme Court affirmed the convictions but remanded the matter for resentencing. *State v. Washington*, 68 P.3d 134 (Kan. 2003)(*Washington I*).

     On remand, the trial court re-imposed the sentences of life without parole for 50 years and concurrent 18-month term. Petitioner appealed, alleging that the evidence was insufficient to support the Hard 50 term and that the Hard 50 sentencing scheme was unconstitutional. The Kansas Supreme Court affirmed the sentence. *State v. Washington*, 123 P.3d 1265 (Kan. 2005), *cert. denied*, 549 U.S.

1018 (2006)(*Washington II*).

Petitioner then filed a post-conviction motion pursuant to K.S.A. 60-1507, presenting seven claims for relief. The state district court denied relief, and petitioner then filed a notice of appeal and two motions for reconsideration. The district court filed an additional memorandum decision denying relief, and petitioner filed a second notice of appeal. The Kansas Court of Appeals affirmed that decision. *Washington v. State*, 216 P.3d 191, 2009 WL 3082582 (Kan.App. 2009)(*Washington III*).

Petitioner again sought review in the Kansas Supreme Court. The Kansas Supreme Court denied review, and petitioner commenced this action on February 23, 2011.

On September 18, 2012, the court entered a stay in this matter to allow petitioner to present certain additional claims in the state courts. That process is completed; however, because petitioner failed to timely present a petition for review in the Kansas Supreme Court, those claims are barred by his procedural default. This court lifted the stay on April 8, 2014. The present petition therefore addresses only the claims presented in the original petition, namely, (1) the prosecution's use of peremptory challenges violated petitioner's right to equal protection; (2) the trial court erred in admitting petitioner's confession; (3) petitioner was denied the effective assistance of counsel during the pretrial motion to suppress the confession; (4) the prosecution committed misconduct in its statements concerning the mental defense offered; (5) the trial court erred in limiting cross-examination of Dr. William Logan; (6) the failure of the Kansas Legislature to define premeditation and the action of the Kansas Supreme Court defining the element of

premeditation violates the separation of powers doctrine; (7) the definition of premeditation under Kansas law denied petitioner equal protection and substantive due process; (8) the district court improperly instructed the jury on the prosecution's burden of proof regarding self-defense and denied petitioner due process and a fair trial; and (9) the trial court erred in responding to a jury question outside petitioner's presence.

*Factual background*

The Kansas Supreme Court summarized the facts of petitioner's crime as follows:

> Marcus Washington was convicted of first-degree premeditated murder and criminal possession of a firearm based upon the January 16, 2000, shooting death of Stacey Quinn. The defendant was sentenced to 50 years in prison without the possibility of parole (a hard 50 sentence). […]

> Officer James Bauer of the Kansas City, Kansas Police Department responded to a report of shots fired in the neighborhood of 33rd and Farrow at 1:26 a.m. He found a woman later identified as Stacey Quinn, laying on the lawn of Beatrice Cannon's home at 3217 Farrow. Medical personnel summoned to the scene determined that Quinn was dead.

> Erik Mitchell, a forensic pathologist, testified that Quinn suffered a number of gunshot injuries, with entry and exit wounds to her neck, chest, torso, and extremities. Dr. Mitchell recovered a bullet from Quinn's clothing and another from the surface of Quinn's neck. He also recovered a bullet from Quinn's liver. Dr. Mitchell opined that Quinn died from the gunshot wounds, which caused internal hemorrhaging and great blood loss.

> *Neighbors' Trial Testimony*
> Erica Warrior, who lived next door to where Quinn's body was found, testified that she heard gunshots in the early morning hours, dialed 911, and then heard a young woman cry for help. After the 911 call, Warrior heard another set of gunshots. Contrary to the defendant's testimony, Warrior did not hear tires screeching and did not hear a car speeding away. She also did not hear the victim make a threatening statement.

John Carr also lived next door to the crime scene. At approximately 1:30 a.m., he heard a volley of about 10 shots, which lasted about 5 seconds. The shots sounded to Carr like they came from a handgun. Carr testified he then heard a woman cry for help. According to Carr, he heard the woman say, "Help me, oh help me, please somebody help me." Carr testified that the woman's cry sounded like it came from Cannon's house.

Carr called the authorities, and as he was calling he heard a second volley of shots. Carr believed the second volley also contained 10 shots and lasted about 5 seconds. Carr said that 1 minute lapsed between the first volley of shots and the woman's cry, and less than 1 minute lapsed between the cry and the second volley. He did not hear an automobile collision or screeching tires during this time.

Carr's daughter also testified and generally confirmed her father's testimony. In addition, she testified that she looked out of her bedroom window and viewed a man with a gun run across the front lawn of her house. Carr's daughter identified the defendant to the jury as the man she saw run in front of her house.

Mashan Minor, who resides three houses from the crime scene, testified that the early morning shots woke her up. She opened her front door and saw a young lady hopping in the street on the corner of 33rd and Farrow. Minor observed that a shoe was in the middle of the street. She also heard the victim at Cannon's house knocking on the door and pleading for help. Minor looked out the door again and observed someone standing in Cannon's driveway. Minor shut her door and then heard another round of gunfire.

*Investigation of Evidence at the Crime Scene*
After calling for medical help, Officer Bauer testified he noticed blood at one location and shell casings at two different locations. Marvin Main, a crime scene technician for the police department, identified and gathered the shell casings at 33rd and Farrow and those found near the body of the victim. He found no firearm at the scene or on the body of the victim. He recovered a bullet from the living room of Cannon's house. Officers also recovered .40 caliber bullets from the scene, in addition on one .25 caliber casing which tended to support the defendant's theory that Quinn shot at him with a small caliber firearm.

Officers found a Chevrolet Cavalier parked on 33rd Street not far from where Quinn's body lay. The vehicle's engine

was still warm. The car was locked, but the keys were lying on the back floorboard of the vehicle. The Chevrolet Cavalier was registered to Nina Betts. Detective Zeigler, along with another detective, Roger Golubski, contacted Betts at her apartment between 8:30 and 8:45 that morning. The defendant answered their knock at the door, and Zeigler asked to speak with Betts. Zeigler went outside with Betts and asked about her car. According to Zeigler, Betts said that when her mother had left around 11 the night before, her car was still parked outside. There was no indication, such as broken glass, that the car had been stolen.

Betts told Zeigler that the defendant had been at her apartment the entire evening. Zeigler wanted to get both the defendant and Betts to the detective bureau to see whether their stories matched. Zeigler asked the defendant to go to the detective bureau, and the defendant agreed. Zeigler also asked Betts' permission to search her apartment. She agreed, and officers found a Styrofoam container for bullets in the bathroom. They also found a bullet on the floor of a closet in a bedroom and a handgun in the closet which was later identified as the one used against the victim, Stacy Quinn. Betts had denied that any firearms were in her apartment.

Zeigler and his partner, Golubski, took Betts' statement at the detective bureau at around 1:15 p.m., and then took the defendant's statement. At one point during the discussions with the defendant, he began to cry uncontrollably. The detectives concluded that the defendant might implicate himself in the shooting. After settling the defendant down, the detectives advised him of his *Miranda* rights. He acknowledged these rights and elected to talk to the detectives. He admitted his involvement in the shooting. An audiotape of the defendant's statement was played for the jury, and a transcript from the interview was shown to the jury.

The defendant testified that he was deathly afraid of a man by the name of Hill at the time of the shooting, who, according to the defendant, had made prior attempts on the defendant's life. He believed the victim, Stacey Quinn was involved with Hill in a plot on his life. Because of this fear, the defendant testified he acted in self-defense in shooting Quinn. Consistent with psychiatric testimony on his behalf, the defendant testified that he had not intended to kill Quinn and that he had not possessed the mental state necessary to commit the crime of premeditated murder.

The defendant's ex-wife, Sony Reeves, testified that Hill

demonstrated threatening behavior toward the defendant on two occasions and, after each of these incidents, the defendant was very scared. In August or September 1999, she bought the .40 caliber handgun because there had been break-ins at the apartments where she lived. Reeves left the handgun at the house of the defendant's mother when she and the defendant separated in October 1999. On cross-examination, Reeves identified the firearm recovered from Betts' apartment as the one she had purchased.

Betts testified that there was no damage to the Chevrolet Cavalier on the day before the shooting. However, after the shooting, Betts noted that there was a dent behind the driver's side door. Betts also testified that after the shooting, there were approximately five to eight new dents on the passenger door which looked like buckshots.

The defendant testified concerning the first incident between him and Hill which occurred in a parking lot during the summer of 1997. The defendant told the jury that Hill fired shots at him and that he had been afraid of Hill from that time on. The defendant did not report this incident to the police. The second incident occurred in June 1998 while the defendant attended a barbecue. A vehicle pulled up to the house and stopped, and Hill emerged from the vehicle pointing a gun at the defendant. The defendant testified he dove through a screen door to protect himself. The police were called, and they responded to the scene.

The defendant testified that as a result of the two incidents he had been having nightmares in which he was killed as a result of an altercation with Hill. In his dream, the defendant was unable to make it through the screen door. The defendant testified that his fear of being killed existed at the time of the shooting and continued to exist at the time of his testimony at trial.

The defendant also described for the jury his version of the events that led to Quinn's death. He received a call from his mother the night before the shooting. She asked him to pick up his younger brother from a skating rink which closed at 11:30 p.m. The defendant picked up his brother from the skating rink and dropped him off at his mother's house. He then visited a friend for about an hour, leaving around 1 a.m. and drove by his mother's house to make sure that everything was in order there.

After driving past his mother's house, he saw a woman frantically waving her arms along the street in the area of 27th and Brown. The defendant partially rolled down his

window to see what the trouble was. The woman, who was later identified as Quinn, asked the defendant whether he had any "yay." The defendant said that he did not sell drugs. Quinn asked for a ride and the defendant agreed to give her a lift. Quinn asked the defendant to let her visit a house at 3216 Farrow. The defendant turned right off of Farrow onto 33rd Street and waited for Quinn to return to his car. Quinn returned to the defendant's car, and the defendant began to reverse toward Farrow to leave.

At this point, the defendant said that another vehicle heading east on Farrow struck his car while he was in the process of backing onto Farrow. The defendant said that he panicked and drove a short distance forward on 33rd and then stopped.

The defendant said that he believed Hill or Hill's relatives were somehow involved in the collision. The defendant grabbed the .40 caliber firearm and got out of the car. Quinn tried to wrestle the gun away from the defendant, but the defendant managed to get the gun and exit the vehicle. The defendant proceeded to walk down 33rd toward the intersection of 33rd and Farrow. The vehicle that collided with the defendant's vehicle approached the defendant. He pointed his firearm at the car, and the car reversed away from the defendant. The defendant shot at the vehicle. The defendant said that he was fearful.

As he returned to his vehicle in order to call the police, Quinn confronted him pointing a small caliber chrome firearm directly at him from the middle of the street. The defendant described the woman as wild-eyed and shaking. He thought that Quinn was under the influence of something. The defendant testified that Quinn said that she was going to "--- [him] up." According to the defendant, Quinn fired first and he fired back without stopping until his gun was empty.

The defendant said he went back to his car but the keys that he thought were in the ignition when he left his car were gone. The defendant ran down the street, and a man picked him up and took him home. The defendant told the jury he did not intend to shoot Quinn. When he returned to Betts' apartment, Betts was there, and she was sleeping.

The defendant called Steven Weinberg, an accident reconstructionist, to testify. In Weinberg's opinion, the damage to Betts' car was consistent with the story that his car was parked and that it was impacted by a larger vehicle. Weinberg testified that the damage to the passenger side

of the vehicle appeared to be caused by gunshots. Weinberg observed eight distinctive dents. Weinberg opined that a small-caliber firearm, either a .22 or a .25 caliber would have caused the damage to the passenger side of the vehicle. According to Weinberg, the bullets came at an angle from the rear of the car, which was consistent with the defendant's story that he encountered Quinn standing in the middle of Farrow.

The defendant also called Gilbert Parks, a psychiatrist, to testify. Dr. Parks testified he met with the defendant on five different occasions and the defendant talked to Dr. Parks about the two incidents involving Hill. Dr. Parks believed each of the incidents involving Hill were key to understanding the defendant's emotional state. Dr. Parks testified that the incidents between Hill and the defendant were traumas for the defendant. Dr. Parks diagnosed the defendant with having suffered from posttraumatic stress disorder (PTSD) on the day of the shooting. Dr. Parks said that when Quinn pointed a gun at the defendant, it was just another of a string of incidents during which the defendant perceived a threat to his life. It was Dr. Parks' opinion that the defendant did not possess the requisite intent of willfulness when he shot Quinn. Dr. Parks believed that the defendant was not capable of intentionally shooting Quinn that day.

In rebuttal, William Logan, a psychiatrist, criticized Dr. Parks' diagnosis. Dr. Logan reviewed a report written by Dr. Parks and found that it did not list the qualifying symptoms for PTSD. Dr. Logan questioned why Dr. Parks did not interview the people surrounding the defendant to verify the symptoms the defendant described. Dr. Logan said that PTSD did not explain why the defendant would have followed Quinn to Cannon's front steps. Further, Dr. Logan found it questionable that someone suffering from PTSD would pick up a stranger so early in the morning.

To counter Dr. Logan's testimony, the defendant called another psychiatrist, Elizabeth Roberta Hatcher, who testified that after reviewing Dr. Parks' report she did not find anything that would lead her to believe the defendant was not suffering from PTSD. *Washington I*, 68 P.3d at 140-143.

*Standard of review*

This matter is governed by the Antiterrorism and Effective Death

Penalty Act (AEDPA). The AEDPA established a highly deferential standard of review of state court proceedings. When a state prisoner presents a claim that has been adjudicated by the state courts, the habeas court may not grant relief unless it determines that the state court proceedings resulted in a decision (1) "that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "that was based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Clearly established law is determined by the United States Supreme Court, and refers to the Court's holdings, as opposed to the dicta." *Lockett v. Trammel*, 711 F.3d 1218, 1231 (10th Cir. 2013). A state court's decision is "contrary to" established Supreme Court law where the state court reaches a conclusion opposite of that reached by the Supreme Court on a question of law or decides a case differently than the Supreme Court on materially indistinguishable facts. *Dodd v. Trammell*, 753 F.3d 971, 982 (10th Cir. 2013)(citing *Williams v. Taylor*, 529 U.S. 362, 413 (2000)).

Finally, a state court's decision is an "unreasonable application" of Supreme Court case law if "the state court identifies the correct governing legal rule…but unreasonably applies that principle to the facts of the prisoner's case." *Gipson v. Jordan*, 376 F.3d 1193, 1196 (10th 2004)(brackets and internal quotation marks omitted).

The United States Supreme Court recognizes that "AEDPA erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court. AEDPA requires 'a state

prisoner [to] show that the state court's ruling on the claims being presented in federal court was so lacking in justification that there was an error … beyond any possibility for fairminded disagreement.'" *Burt v. Titlow*, ___ U.S. ___, ___, 134 S.Ct. 10, 16 (2013)(quoting *Harrington v. Richter*, 562 U.S. ___, ___, 131 S.Ct. 770, 786-87 (2011)).

*Analysis*

*Issue 1: Use of peremptory challenges*

During jury selection, the prosecutor used twelve peremptory challenges to strike potential jurors. Ten of those persons were African American. Petitioner was tried by a jury of two African-Americans, one Asian-American, one Native American, and eight white jurors. *Washington I*, 68 P.3d at 145. Following jury selection, petitioner lodged an objection pursuant to *Batson v. Kentucky*, 476 U.S. 79, (1986).

In *Batson*, the United States Supreme Court held that purposeful discrimination based upon the race of a potential juror violates the Equal Protection Clause of the Fourteenth Amendment. 476 U.S. at 84. Under *Batson*, the courts employ a three-part analysis to determine whether a peremptory strike violates the defendant's right to equal protection. First, the defendant must present a prima facie case by establishing facts that provide an inference of discriminatory purpose; second, if the defendant makes that showing, the burden shifts to the prosecution to provide a race-neutral justification for the strike; and third, if the prosecution provides such a showing, the court then determines whether purposeful discrimination has occurred. *U.S. v. Exom*, ___ Fed. Appx. ___, 2014 WL 1688449, *2 (10th Cir. 2014)(citing *Johnson v. California*, 545 U.S. 162, 168 (2005)).

A race-neutral justification "means an explanation based on something other than the race of the juror." *Hernandez v. New York*, 500 U.S. 352, 360 (1991).

The trial court's decision on the third step of this inquiry is entitled to considerable deference on appeal. *Id.* at 364-65.

On direct appeal, the Kansas Supreme Court found that petitioner waived *Batson* challenges to four potential jurors by conceding to the prosecution's race-neutral explanations for three of them, Blake, Fielder, and Collins, and by failing to mention the fourth, McDonald, on appeal.

Accordingly, in this action, the court considers only petitioner's challenges to the peremptory strikes against potential jurors Spratt, Hodges, Anderson, Bullock, Brantley, and Powers.

Spratt

The prosecutor provided three reasons for striking Ms. Spratt, first, that she was evasive on the kind of jury she previously served on; second, that she had difficulty in remembering or understanding what that case involved; and third, that she "live[d] in the projects", where numerous homicides occurred.

The Kansas Supreme Court said:

> Spratt admitted that she vaguely remembered the facts of the prior case and that she was unsure about how to describe what seemed to be a simple robbery. This alone constitutes a facially valid, race-neutral reason to strike Spratt. Thus, regardless of how one might view the prosecutor's remarks concerning Spratt's residence, the defendant's *Batson* challenge as to Spratt fails. *Washington I*, 68 P.3d at 145.

Hodges

Ms. Hodges stated during voir dire that she worked two jobs, one of which ended at 10 p.m.; that she held a bachelor's degree in business

administration; and that she had served on a criminal jury about 15 years earlier in a matter involving a shooting. The prosecutor explained the grounds for striking this venireperson as her evasiveness concerning prior jury service and her difficulty in understanding or explaining what that case involved.

The Kansas Supreme Court stated that while it could not make a determination concerning Hodges' demeanor,

> "[t]he State also points out the detail with which a white potential juror described his prior jury experience, recalling that the case in which he served as a juror was a robbery and murder and remembering that the prosecutor in the case was now the judge presiding over the defendant's trial. We conclude the trial court was correct in its determination that the State established a facially valid race-neutral reason for striking Hodges." 68 P.3d at 656.

Anderson

This potential juror stated that Greg Hill was her cousin, whose age she estimated at 18. The prosecution then stated the Greg Hill involved in the case was approximately 28, but later corrected that to estimate his age as 25. Ms. Anderson then stated she did not know the age of her cousin but that if her cousin were involved in the matter, it would not affect her ability to consider the matter.

The prosecution explained striking this potential juror due to the potential family relationship between her and someone involved in the case. The Kansas Supreme Court found that the possibility of such a relationship provided a "facially valid race-neutral reason for striking Anderson…." 68 P.3d at 657.

Bullock

Venireperson Bullock did not properly fill out the juror

questionnaire, providing inconsistent answers and failing to properly complete items, as, for example, providing the names of her children instead of their ages, as sought by the question. The prosecution explained striking this potential juror on the ground that she could not follow directions.

While petitioner argued on direct appeal that two other potential jurors had provided the gender of their children, the Kansas Supreme Court noted they had also provided the children's ages as directed. The court found that the prosecution had provided a facially valid, race-neutral ground for striking Bullock. 68 P.3d at 146.

Brantley

The prosecutor explained the challenge striking venireperson Brantley was due to his statement that he knew someone who carried a gun to protect himself, as she believed that similar reasoning concerning the petitioner might be developed at trial. The district court found this reason was race-neutral, and the Kansas Supreme Court agreed, stating his response "indicated sympathy for the need to carry a gun for self-protection. This sympathy, in turn, translated into sympathy for the defendant's theory at trial." 68 P.3d at 147.

Powers

The prosecution explained it struck Ms. Powers, a high school student aged 18, because of her youth and relative inexperience. The district court found this explanation was race-neutral.

The Kansas Supreme Court agreed, stating that "[w]hile Powers certainly had had life experiences, she likely had fewer that the

remainder of the potential jurors." 68 P.3d at 147. This is consistent
with case law in the Tenth Circuit. *See Hidalgo v. Fagen, Inc.*, 206
F.3d 1013, 1019 (10th Cir. 2000)(recognizing youth as a race-neutral
basis for use of a peremptory strike).

To prove a violation of equal protection under *Batson*, petitioner
must show that the prosecution engaged in purposeful discrimination
on the basis of race in striking potential jurors. *See Sallahdin v.
Gibson*, 275 F.3d 1211, 1225-26 (10th Cir. 2002).

The federal court, sitting in habeas, may grant relief only if
it "was unreasonable to credit the prosecutor's race-neutral
explanations for a *Batson* challenge." *Rice v. Collins*, 546 U.S. 333,
338 (2006). Here, the determinations of the Kansas appellate court
were well-grounded and reasonable, and the court finds no basis to
grant relief.

*Issue 2: Admission of petitioner's confession*

Petitioner contends his confession should not have been
admitted, alleging that he was placed under arrest without probable
cause at the apartment of Nina Betts.

The trial court, ruling on a motion to suppress the confession,
found petitioner was not in custody prior to the time he was given
*Miranda* warnings at the police station and denied the motion to
suppress.

The Kansas Supreme Court summarized the evidence presented to
the trial court as follows:

The evidence presented through [Detective] Ziegler
established that the defendant initially agreed to

accompany the detectives to the station. In his brief on appeal, the defendant admits as much by stating that although he may have initially gone to the station voluntarily, he was clearly being detained and at some point had been seized. The other evidence before the court indicated that the defendant was not in an interrogation room but was in a victim's room with a television set available. He did wait approximately 4 hours at the station, but most of that time was accounted for based upon the delay faced by the detectives in searching Betts' apartment.

The defendant, according to the evidence before the trial court, was not advised of the outstanding warrants and was not formally arrested or handcuffed. He was asked if he would come to the station to answer questions at a time when the detectives did not know who he was and did not suspect him of the crime they were investigating. The defendant was free not to go to the station and would not have gone there had he declined the invitation. Other than the time lapse after the defendant came to the station, most of which was consumed by a search of Betts' apartment and by the questioning of Betts, there was no evidence to establish that the defendant was in custody. *Washington I*, 68 P.3d at 150-51.

The Kansas Supreme Court determined that the decision of the trial court was supported by "substantial competent evidence" and concluded, upon de novo review of the legal issue that the petitioner was not under arrest or in custody prior to the *Miranda* warnings. *Id.* at 151.

The decision of the Kansas Supreme Court reflects that it applied the correct standard of review under federal law. *See, e.g., U.S. v. Achana-Suaso*, 568 Fed. Appx. 627, 630 (10th Cir. 2014)(a court assessing the denial of a motion to suppress accepts factual findings and determinations of credibility unless they are clearly erroneous and reviews legal conclusions de novo).

After reviewing the record, this court concludes the Kansas

Supreme Court reasonably applied the standard. The testimony of Detective Ziegler explained the sequence of events, the petitioner's response to the request that he come to the police station, and the reasons for the delay. Petitioner was told he did not have to talk to the detectives and was given *Miranda* warnings and signed a printed form containing those rights. Finally, there is no evidence of any coercive behavior, such as threats.

There is no basis for habeas corpus relief on this claim.

*Issue 3: ineffective assistance of counsel for suppression motion*

Petitioner asserts he was denied the effective assistance of counsel during the motion to suppress due to his counsel's failure to present additional evidence. He presented this claim in a motion for a new trial. The trial court held a hearing on that motion, and petitioner was represented by new counsel. In response to a question from the court, counsel stated she was arguing both that the court had erred in its ruling and that prior counsel was ineffective because he failed to present additional evidence.

Counsel presented two witnesses, and petitioner testified. Betts testified that she was transported to the police station in another vehicle, and a detective, Detective Michael, testified that although he monitored the petitioner in a victim's room, he had no idea whether petitioner was a suspect or a witness at the time. Detective Ziegler also testified, explaining that petitioner was frisked before being placed in the patrol car as a matter of routine safety procedure, and that he may have told the transporting officer that there were

outstanding warrants. Petitioner testified that he was told before he left the apartment that he had outstanding traffic warrants, and that he believed he was under arrest for those warrants and could not leave.

The trial court ruled from the bench that the only new information provided was the petitioner's testimony that he believed that he was in custody and that he was guarded by Detective Michael during his time at the station. The court determined that petitioner voluntarily went to the station and that petitioner's counsel had provided effective representation.

The Kansas Supreme Court stated that the trial court's determination that petitioner's testimony was self-serving and lacked credibility could not be reweighed on review, and it noted that petitioner had the chance to testify at the initial suppression hearing but chose not to do so.

It applied the standard announced in *Strickland v. Washington*, 466 U.S. 668, 687 (1984) and determined that petitioner had shown neither substandard performance nor prejudice to the petitioner.

It is apparent that the Kansas Supreme Court applied the appropriate federal standard, namely, that announced in *Strickland*. Likewise, this court's review of the record shows that the standard was reasonably applied to the circumstances of this case. The Kansas Supreme Court carefully examined the performance of petitioner's counsel, which was thorough, and it determined that petitioner had not shown that he would have obtained a different result on the motion

to suppress had counsel presented additional evidence. Petitioner is not entitled to relief on this claim.

*Issue 4: prosecutorial comment on mental defense*

Petitioner alleges statements by the prosecutor during closing argument denied him a fair trial.

The statements were summarized by the Kansas Supreme Court as follows:

> During her closing arguments, the prosecutor argued that "posttraumatic stress disorder does not give someone a license to kill." The defendant's objection to this argument was sustained, and the jury was admonished to disregard the argument. When she began her argument again, the prosecutor said that the defendant's defense attorney "wants [the jury] to find that posttraumatic stress disorder excuses [the defendant's] conduct." This time the defendant's objection was overruled. On appeal the defendant complains that the prosecutor "diminish[ed] the existence of the posttraumatic stress disorder and the mental disease or defect defense." *Washington I*, 68 P.3d at 154.

The Kansas Supreme Court found that the first reference to the mental defense was cured by the trial court's admonition to the jury. It found that the second such reference was not prejudicial, noting that the trial court instructed the jury on state law concerning mental disease or defect and criminal intent, that the reference in closing argument was only a small mention in the context of the lengthy proceeding, and that the evidence of the petitioner's guilt was overwhelming. *Id*. at 154-55.

This analysis applied the correct legal standard. Habeas corpus relief is proper when a prosecutor's comment has "so infected the trial with unfairness as to make the resulting conviction a denial of due

process." *Darden v. Wainwright*, 477 U.S. 168, 180 (1986)(quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).

A petitioner seeking relief for alleged prosecutorial misconduct must show that the error is "of sufficient significance to result in the denial of the [petitioner's] right to a fair trial." *Green v. Miller*, 483 U.S. 756, 765 (1987)(internal quotation marks omitted).

In this analysis, the prosecutor's statement or act is viewed not in isolation, but in light of the entire trial. *Id.* at 765-66. In reviewing the record, the court considers "the strength of the evidence against the petitioner… [and] [a]ny cautionary steps – such as instruction to the jury – offered by the court to counteract improper remarks." *Le v. Mullin*, 311 F.3d 1002, 1013 (10th Cir. 2002).

The Kansas Supreme Court applied this standard by considering the admonition of the trial court following the first reference to the theory of defense and by its consideration of the strength of the case against petitioner in the context of the entire trial record. The application of the standard was reasonable, and there is no basis for habeas corpus relief.

*Issue 5: limitation of cross-examination of Dr. Logan*

Petitioner next alleges error in the trial court's limitation his cross-examination of the prosecution's rebuttal witness, Dr. Logan. The defense sought to question Dr. Logan concerning prior assaults on the petitioner and another, unrelated case in which Dr. Logan testified.

The trial court allowed the defense to inquire only generally

about past incidents, as specific evidence of those matters had not been admitted, and it allowed the defense to cross-examine Dr. Logan on dissociative symptoms but not the specific facts of the unrelated case in which he had testified.

The Kansas Supreme Court analyzed this claim under the framework in *State v. Jacques*, 14 P.3d 409 (2000). That analysis rests on federal precedent in *Davis v. Alaska*, 415 U.S. 308 (1974) and *Delaware v. Van Arsdall*, 475 U.S. 673 (1986).

The Sixth Amendment protects the right of a criminal defendant "to be confronted with the witnesses against him." U.S. Const. amend. VI. A core component of the right to confrontation is the right of the accused to cross-examine adverse witnesses. *Davis*, 415 U.S. at 315-16. The right to confrontation, though, is not absolute, and the trial court has latitude "to impose reasonable limits on … cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, … or interrogation that is repetitive or only marginally relevant." *Van Arsdall*, 475 U.S. at 679.

The Kansas Supreme Court found no abuse of discretion by the trial court in the limitations placed upon the testimony of Dr. Logan because the details of the earlier incident concerning petitioner were not the subject of the direct examination, and because petitioner's counsel was allowed to explore the question of bias. Notably, defense counsel was able to question Dr. Logan on his hourly fee, whether he previously had worked for the prosecutor, and when he was contacted

and how much time he spent on the case. (R. XI, pp. 1278-80.)

The analysis of the Kansas Supreme Court is a reasonable application of federal precedent, and petitioner is not entitled to relief. The decisions of the trial court are grounded in the established rules of evidence, and the trial court allowed defense counsel the opportunity for cross-examination protected by the Sixth Amendment.

*Issue 6: separation of powers violation*

Petitioner alleges that the Kansas Supreme Court's interpretation of the term "premeditation", as used in K.S.A. 21-3401, violates the separation of powers doctrine.

Respondent contends that this claim is not cognizable in federal habeas corpus because it does not present a federal constitutional question.

It is settled that federal habeas corpus review does not lie for errors of state law. *See Swarthout v. Cooke*, 562 U.S. 216, 219 (2011)(citing *Wilson v. Corcoran*, 562 U.S. 1, 5 (2010) and *Estelle v. McGuire*, 502 U.S. 62, 67 (1991)). The separation of powers issue here is exactly such a question. *See, e.g., Chromiak v. Field*, 406 F.2d 502, 505 (9th Cir. 1969)(federal constitutional doctrine of separation of powers applies only to the operation of the federal government is not binding on the states; likewise, the resolution of a separation of powers issue under the state Constitution is a matter for the state courts to resolve). Petitioner cannot seek federal habeas relief on this claim.

*Issue 7: denial of due process or equal protection*

Petitioner claims that Kansas case law on premeditation is inconsistent and confusing to such an extent that he was denied due process and equal protection.

The Kansas Court of Appeals rejected this claim on two grounds. First, it determined that petitioner lacked standing to challenge the entire body of state case law; second, it found the claim simply lacked merit. Plaintiff cited no authority supporting his claim, nor did he show he was treated differently than anyone else. *Washington III*, 2009 WL 3082582 at *5.

To the extent that petitioner argues the definition of "premeditation" is not adequately distinguished from an intentional killing, the court finds that point has been resolved against his position. In *Sperry v. McKune*, 445 F.3d 1268 (10th Cir. 2006), the Tenth Circuit rejected the claim of a Kansas prisoner that defining "premeditation" as "to have thought over the matter beforehand" would render the state first-degree murder statute essentially indistinguishable from its second-degree murder statute.

The Tenth Circuit noted that while some concurring opinions appearing in state case law suggest that the issue may be debated, a majority of the Kansas justice have found that the definition of premedication is acceptable. The federal appellate court found that the decision of the Kansas Court of Appeals rejecting the vagueness challenge in *Sperry* reasonably applied federal due process law and satisfied the AEDPA standard. *See Sperry*, 445 F.3d at 1272-73 ("An

ordinary person could discern a difference between a killing that is committed intentionally and a killing that is committed intentionally and with premeditation.") Petitioner's due process claim fails.

This court also finds that petitioner has not shown how his conviction under the first-degree murder statute resulted in his being treated differently from anyone similarly situated. *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)(Equal protection "is essentially a direction that all persons similarly situated should be treated alike.") Petitioner is not entitled to relief on this claim.

*Issue 8: instruction on burden of proof*

Petitioner claims that the trial court failed to properly instruct the jury on the burden of proof in its instruction on self-defense.

The Kansas Court of Appeals summarized the background as follows:

At Washington's trial, defense counsel requested the following instructions, which the district court refused: (1) "'that the government has the burden of proof beyond a reasonable doubt that defendant did not act in self-defense,'" and (2) "if you find … the defendant did act in self-defense, you must find him not guilty." On direct appeal, Washington's appellate counsel did not challenge the district court's failure to give these instructions. *See Washington*, 275 Kan. At 652-53, 68 P.3d 134 (stating Washington's issues raised on direct appeal).

*Washington III*, 2009 WL 3082582 at *6.

The Kansas Court of Appeals determined that petitioner failed to properly challenge the jury instruction by presenting it in his direct appeal. And while a movant in a state post-conviction action may present such a claim upon a showing of exceptional circumstances

excusing the failure to present the claim on appeal, the appellate court found that petitioner did not make the requisite showing. The court thus rejected the issue as abandoned. *Id*.

The Antiterrorism and Effective Death Penalty Act (AEDPA) "strictly limits a federal court's ability to consider issues on habeas review that the state court deemed procedurally barred." *Hammon v. Ward*, 466 F.3d 919, 925 (10th Cir. 2006). The federal courts "do not review issues that have been defaulted in state court on an independent and adequate state procedural ground, unless the default is excused through a showing of cause and actual prejudice or a fundamental miscarriage of justice." *Jackson v. Shanks*, 143 F.3d 1313, 1317 (10th Cir. 1998).

To demonstrate cause, petitioner must show that some objective factor external to the defense prevented his compliance with the state procedural rule. *See Murray v. Carrier*, 477 U.S. 473, 488 (1986). If petitioner can demonstrate cause, he must then show "actual prejudice as a result of the alleged violation of federal law." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

The fundamental miscarriage of justice is "implicated only in an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Ballinger v. Kerby*, 3 F.3d 1371, 1375 (10th Cir. 1993)(internal quotation marks omitted). The claim of actual innocence must be based upon solid evidence that was not adduced at trial. *Calderon v. Thompson*, 523 U.S. 538, 559 (1998).

Here, the petitioner has not shown cause and prejudice for the procedural default of this claim, nor does the record show that petitioner is actually innocent. Petitioner was identified by a witness to the shooting, the weapon and the car associated with the crime were identified as belonging to the petitioner's girlfriend, and, most importantly, petitioner made a confession to police.

The record clearly shows that the claim was procedurally defaulted in the state courts, and the petitioner has not met the high threshold of either cause and prejudice or a fundamental miscarriage of justice to excuse the default. Petitioner is not entitled to relief.

*Issue 9: response to jury's question during deliberations*

Petitioner claims his right to be present at all critical stages of the proceedings was violated when the district court addressed a question by the jury during its deliberations.

The Kansas Court of Appeals summarized the facts:

> After jury deliberations began at Washington's trial, the jury sent the district court a note which read: "'Please clarify premeditation. How long before the act?'" The note further stated: "'Expound on premeditation.'" When the judge read the jury note, the prosecutor appeared in person in the judge's chambers, Washington's counsel participated by telephone, and Washington was not present at all. After reading the note out loud, the judge stated he intended to "tell [the jury] that they need to rely upon the instructions they've been given." Washington's counsel stated on the record that he had no objection to the judge's proposed response. The transcript does not record the district court's actual response in open court to the jury's question.

*Washington III*, 2009 WL 3082582 at *6.

The Kansas Court of Appeals found that while petitioner had no right to be present during the trial court's consideration of the jury

question, it was error under state law and federal constitutional law
to proceed outside his presence when the response was submitted to
the jury. The court applied a harmless error standard and determined
that under the circumstances, the error was harmless beyond a
reasonable doubt. *Id.* at *7-8.

The state appellate court applied the correct legal standard.
A constitutional error occurring at trial is harmless, and not grounds
for habeas corpus relief, unless the error "'had a substantial and
injurious effect or influence in determining the jury's verdict.'"
*Brecht v. Abrahamson*, 507 U.S. 619, 637 (1987)(quoting *Kotteakos v.
United States*, 328 U.S. 750, 776 (1946)). *See also Rogers v. United
States*, 422 U.S. 35, 40 (1975)(a violation of Fed.R.Crim.P. 43,
protecting the defendant's right to be present at trial, may be
harmless error).

In addition, the Kansas Court of Appeals reasonably applied the
federal standard in finding harmless error where the court referred
the jury to the instructions provided and where defense counsel was
present by telephone and able to lodge any objection. The court finds
no basis for habeas corpus relief on this claim.

*Pending motions*

Several motions filed by the parties are pending before the
court, namely, petitioner's motion to file supplemental briefing
(Doc. 43), his combined, renewed motion to appoint counsel and to
submit certified question (Doc. 46), his motion for summary judgment
and respondents' motion to strike (Docs. 48 and 49), petitioner's

motion for evidentiary hearing (Doc. 51), and his motion to supplement (Doc. 52).

The court grants petitioner's motion to file supplemental briefing (Doc. 43) and his motion to substitute a typewritten copy (Doc. 52) and has considered the material submitted (Doc. 44) and respondents' response (Doc. 45).  The court denies petitioner's renewed motion for the appointment of counsel and for certification of a question to the Kansas Supreme Court (Doc. 46).

Petitioner's combined motion for judicial notice of undisputed facts and for summary judgment (Doc. 48) is denied, and respondents' motion to strike that pleading (Doc. 49) is granted. The matter was fully briefed in accordance with the procedure described in the Rules Governing Habeas Corpus Cases Under Section 2254.

Petitioner's motion for evidentiary hearing (Doc. 51) is denied. Generally, "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on its merits." *Cullen v. Pinholster*, ___ U.S. ___, 131 S.Ct. 1388, 1389 (2011). Here, the court finds no basis to conduct an evidentiary hearing.

IT IS, THEREFORE, BY THE COURT ORDERED the petition for habeas corpus is dismissed and all relief is denied.

IT IS FURTHER ORDERED petitioner's motion for order to file a supplemental brief (Doc. 43) and his motion to supplement the record with a typewritten copy of that brief (Doc. 52) are granted.

IT IS FURTHER ORDERED petitioner's combined, renewed motion to appoint counsel and to submit certified question (Doc. 46) is denied.

IT IS FURTHER ORDERED respondents' motion to strike petitioner's motion for summary judgment (Doc. 49) is granted, and the motion for summary judgment (Doc. 48) is denied.

IT IS FURTHER ORDERED petitioner's motion for evidentiary hearing (Doc. 51) is denied.

Copies of this Memorandum and Order shall be transmitted to the parties.

**IT IS SO ORDERED.**

DATED:  This 30th day of March, 2015, at Topeka, Kansas.


S/ Sam A. Crow
SAM A. CROW
U.S. Senior District Judge